IntegrateNYC, Inc. v State of New York (2025 NY Slip Op 05870)

IntegrateNYC, Inc. v State of New York

2025 NY Slip Op 05870

Decided on October 23, 2025

Court of Appeals

Garcia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 23, 2025

No. 75 

[*1]IntegrateNYC, Inc., et al., Respondents,
v
State of New York et al., Appellants, Parents Defending Education, Appellant.

Mark S. Grube, for appellants State of New York et al.
Jeremy W. Shweder, for appellants Bill DeBlasio, as Mayor of New York City et al.
Paul Draper, for appellant Parents Defending Education.
Mark D. Rosenbaum, for respondents.
New York Civil Liberties Union Foundation et al., New York City Bar Association, Center for Educational Equity at Teachers College, Columbia University, amici curiae.

GARCIA, J.:
Plaintiffs allege that the New York City public education system, through its admissions and screening policies, curriculum content, and lack of diversity among the teacher workforce, discriminates against and disproportionately affects Black and Latino students, leading to unequal educational opportunities and negative outcomes for those students. Plaintiffs further allege that these practices and policies deprive Black and Latino students of a sound basic education in contravention of the Education Article of the State Constitution (NY Const, art XI, § 1), denies them equal protection of the laws (NY Const, art I, § 11), and denies them access to educational facilities in violation of the New York State Human Rights Law (Executive Law § 296 [4]). Although plaintiffs identify troubling aspects of New York City's public education system, the claims as presented in the complaint fail as a matter of law.
I.
Plaintiffs, three student and parent organizations and 14 current and former New York City public school students, commenced this action against defendants, the New York State and City actors responsible for overseeing New York City's public education system [FN1]
. They allege that the New York City public school system is highly segregated, due in large part to Black and Latino students underperforming on admissions tests used for entry to the City's "prime educational opportunities," including the Gifted & Talented program, screened middle and high schools, and specialized high schools. Plaintiffs claim that these exams result in a majority of Black and Latino students attending inferior schools that are deficient in terms of physical facilities and instrumentalities of learning, resulting in poor educational outcomes. For example, plaintiffs allege that a majority of Black and Latino students attend schools where more than 75 percent of students are in poverty; in 2020, Black and Latino students received only 4.5 and 6.6 percent of admission offers at specialized high schools, although they composed a combined 70 percent of the school system as a whole; the graduation rates for Black and Latino students in 2020 were around eight and 10 percentage points lower than that of white students, respectively; only eight percent of Black students and 12 percent of Latino students obtained advanced Regents diplomas in 2020, compared to 50 percent of Asian and 35 percent of white students. Therefore, plaintiffs allege, said schools do not deliver a sound basic education as required by the Education Article.
These segregated students, according to the complaint, also receive less than a sound basic education because they are taught a "white and Eurocentric curriculum" rather than one that is "culturally responsive," and because defendants have "failed to recruit and support a diverse educator workforce" and otherwise failed to provide all teachers with "appropriate training . . . on how to deliver a racially equitable and culturally responsive education." With respect to this second argument, their premise that defendants' policies violate the Education Article rests not on a lack of adequate facilities or instrumentalities of learning, but rather on the belief that failure to implement other policies they perceive as essential to the success of those students constitutes a deprivation of a sound basic education.
Plaintiffs make additional claims alleging that defendants have intentionally maintained the admissions system for "prime educational opportunities" despite their knowledge of disparate outcomes, thereby denying plaintiffs equal protection of the laws (NY Const, art I, § 11), and alleging under the NYSHRL that defendants' policies unlawfully denied them use of educational facilities (Executive Law § 296 [4]). Plaintiffs, among other relief, seek a declaratory judgment and an injunction requiring defendants to eliminate the "admissions screens currently in use" in all New York City public schools and prohibiting "future such screens to the extent that they operate in a racially discriminatory manner."
Defendants and intervenor-defendant each moved to dismiss plaintiffs' amended complaint under CPLR 3211 (a) (2) and (7), contending that the court lacked subject matter jurisdiction, and that the complaint failed to state a cause of action. Supreme Court consolidated the motions and dismissed the complaint, holding that it lacked jurisdiction to grant the requested relief because doing so would involve the court in matters of education policy better suited for the legislature, thereby presenting "a nonjusticiable controversy" (2022 WL 1718507, *1 [Sup Ct, NY County, May 25, 2022, No. 152743/2021]). The Appellate Division modified, holding initially that the issues raised in the complaint are justiciable (228 AD3d 152, 161-162 [1st Dept 2024])[FN2]. The Court also held that the complaint states viable causes of action [*2]under the Education Article, the Equal Protection Clause, and as to the City defendants, under the NYSHRL (id. at 163-174)[FN3]. The Appellate Division granted defendants leave to appeal, certifying the question of whether its order was properly made. We answer that question in the negative.
II.
Our role in considering the sufficiency of a pleading on a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7) is well-defined. We must determine only "whether, accepting as true the factual averments of the complaint, plaintiff can succeed upon any reasonable view of the facts stated" (Aristy-Farer v State of New York, 29 NY3d 501, 509 [2017] [internal quotation marks and citations omitted]). The pleadings should be "afforded a liberal construction" (Leon v Martinez, 84 NY2d 83, 87 [1994]), and "[p]laintiffs . . . are entitled to all favorable inferences that can be drawn from their pleadings" (Aristy-Farer, 29 NY3d at 509). While this pleading standard is a liberal one, "[a] pleading is not an empty formality" (id. at 517), and conclusory factual allegations do not provide the support necessary to survive a motion to dismiss even under the CPLR 3211 (a) (7) standard (id. at 516-517; see Godfrey v Spano, 13 NY3d 358, 373 [2009])[FN4]. Plaintiffs fail to meet that standard here.
A.
The Education Article mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1). This provision contemplates "a State-wide system assuring minimal acceptable facilities and services" (Board of Educ., Levittown Union Free Schools Dist. v Nyquist, 57 NY2d 27, 47 [1982]). To satisfy this mandate, "the system in place must at least make available an 'education,' a term we interpreted to connote 'a sound basic education' " (Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 315 [1995] [CFE I], quoting Levittown, 57 NY2d at 48).
This Court has established guidelines for assessing what constitutes a sound basic education, namely that education must "consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (id. at 316). Students must also be afforded the " 'opportunity for a meaningful high school education, one which prepares them to function productively as civic participants' and [to] 'compete for jobs that enable them to support themselves' " (Aristy-Farer, 29 NY3d at 505, quoting Campaign for Fiscal Equity, 100 NY2d 893, 908, 906 [2003] [CFE II]). Certain "essentials" must also be provided:
"Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by [*3]sufficient personnel adequately trained to teach those subject areas" (CFE I, 86 NY2d at 316).
These requirements represent the "constitutional floor with respect to educational adequacy" (id. at 315).
A claim brought under the Education Article requires a showing of both "the deprivation of a sound basic education[] and causes attributable to the State" (New York Civ. Liberties Union v State of New York, 4 NY3d 175, 178-179 [2005] [NYCLU]). To adequately plead a violation, plaintiffs must sufficiently allege "first, that the State fails to provide [plaintiffs] a sound basic education in that it provides deficient inputs—teaching, facilities and instrumentalities of learning—which lead to deficient outputs such as test results and graduation rates" (Paynter v State of New York, 100 NY2d 434, 440 [2003]). Second, plaintiffs must sufficiently allege causation—that the deficient outputs are "causally connected" to the claimed input deficiencies (id.). While Education Article claims considered by this Court have in many cases alleged deficient funding (see e.g. CFE I, 86 NY2d at 312-313; Levittown, 57 NY2d at 47), "the Education Article does not require that there be a single cause in order for plaintiffs to state a claim" (NYCLU, 4 NY3d at 180). However, as in NYCLU, plaintiffs here have "failed to clearly allege even one" such cause (id. & n 2; see also Paynter, 100 NY2d at 440-441).
Two further limitations on Education Article claims merit reference here. First, the deficiencies complained of must represent a "district-wide failure" (see NYCLU, 4 NY3d at 181), that in turn causes students in that district to receive an education below the minimum acceptable floor. Second, the Education Article does not permit judges to micromanage matters of educational policy, which are broadly entrusted to local control (see Ware v Valley Stream High School Dist., 75 NY2d 114, 122 [1989] [noting that "the judiciary should not lightly intrude in the resolution of school conflicts" and that "(d)eference to the education decisions of State and local officials—particularly in matters of curriculum—embodies several important concerns"]; Matter of New York City School Bds. Assn. v Board of Educ. of City School Dist. of City of N.Y., 39 NY2d 111, 121 [1976]). To avoid such intrusion, an Education Article claim requires allegations of a "gross and glaring inadequacy" in the quality of education being provided (see Levittown, 57 NY2d at 48-49; Paynter, 100 NY2d at 439).
Comparison of two prior cases assessing whether an Education Article claim was properly pleaded is instructive. In the first, CFE I, plaintiffs asserted that deficiencies in the State's educational financing scheme meant plaintiffs were "not receiving the opportunity to obtain an education that enables them to speak, listen, read, and write clearly and effectively in English, perform basic mathematical calculations, be knowledgeable about political, economic and social institutions and procedures in this country and abroad, or to acquire the skills, knowledge, understanding and attitudes necessary to participate in democratic self-government" (86 NY2d at 319). The plaintiffs "support[ed] these allegations with fact-based claims of inadequacies" regarding deficient inputs, including statistical information concerning "physical facilities, curricula, numbers of qualified teachers, availability of textbooks, [and] library books" (id.). The Court concluded that based on these allegations, the plaintiffs stated a cognizable Education Article claim because they alleged "gross educational inadequacies that, if proven, could support a conclusion that the State's public school financing system effectively fails to provide for a minimally adequate educational opportunity" (id.).
The Court reached a different result in Paynter (100 NY2d at 438). There, the plaintiffs alleged that their schools had "high levels of poverty concentration and racial isolation," which they argued "correlate[d] with substandard academic performance" and equated to a failure to deliver a sound basic education (id.). We rejected this claim because, unlike the plaintiffs in CFE I, the Paynter plaintiffs did not assert that the "terrible educational results" at their schools were "caused by any deficiency in teaching, facilities or instrumentalities of learning, or any lack of funding" (id. at 440). Instead, the "deficient input" alleged by the plaintiffs was "the composition of the student body," and while we accepted as true the research cited by [*4]the plaintiffs "correlating concentrated poverty and racial isolation with poor educational performance," we held that the plaintiffs did not sufficiently allege causes attributable to the state and arising from its obligation to "provide minimally acceptable educational services" (id. at 441). The allegations in the present case, as in Paynter, are insufficient.
Plaintiffs first allege that "the City's unscreened schools" are deficient in terms of inadequate facilities and instrumentalities of learning. They claim that such schools are in poorly constructed and maintained buildings that suffer from neglect, where students are generally provided an insufficient number of dilapidated and outdated textbooks, lack basic classroom materials, such as working markers, paper, lab equipment, and toilet paper, and experience overcrowded hallways and classrooms. Second, plaintiffs allege that as the result of discriminatory standardized testing policies, Black and Latino students are relegated to these unscreened schools, rather than the "state-of-the-art facilities" with a "wide array of courses and extracurricular activities" offered at screened and specialized schools, and are therefore deprived of a sound basic education. Third, plaintiffs allege that they are deprived of a sound basic education because they are taught a "white and Eurocentric" curriculum and because defendants have "failed to recruit and support a diverse educator workforce" and otherwise failed to provide all teachers with "appropriate training . . . on how to deliver a racially equitable and culturally responsive education." These inadequate inputs, plaintiffs claim, cause Black and Latino students to experience lower graduation rates when compared to white students in the district, receive fewer admissions offers for the Gifted & Talented program, screened schools, and specialized high schools, and earn fewer advanced Regents diplomas when compared to Asian and white students.
Initially, the claims of deficient inputs at unscreened schools—the more traditional allegations concerning the condition of facilities and tools for learning—are insufficient to state a cause of action for the "fundamental reason" that they "do not allege any district-wide failure" (NYCLU, 4 NY3d at 181). Plaintiffs identify a single school as an example of a "poorly maintained" facility and the remaining allegations regarding unscreened schools are vague. By comparison, the CFE plaintiffs supported their allegations regarding teacher quality with data establishing that New York City schools had "the largest percentage of uncertified teachers (11.8% . . . , compared to 7.3% statewide, and 4.6% in suburban districts), the least experienced teachers (13 years, compared to 16 years statewide, and 19 years for suburban districts) and the highest teacher turnover rate in the state (14% . . . , compared to a statewide average of 9% and a suburban average of 7%)" (complaint in CFE I, 86 NY2d 307 [1995], available at 1993 WL 13159629). Regarding instrumentalities of learning, the CFE I complaint offered data showing that New York City schools "on average had only one computer for every 19 students, compared to a statewide public school average of one computer for every 13 students" and "had an average of only 10.4 library books per pupil, compared with 20.9 in suburban areas, and 16.5 statewide" (id.). The complaint also contained statistical information concerning overcrowding in schools, alleging that: "many students attend[ed] schools with an utilization rate of 170% or higher, and the average utilization rate for New York City high schools . . . was 119.9%" (id.).
Not only does the complaint here fail to allege a district-wide failure to put minimally adequate resources in classrooms, but the failures that it does allege are vague and conclusory. Plaintiffs claim that at unscreened schools, students have "[a]n insufficient number of textbooks, requiring a single textbook to be shared by up to three students," that they "[l]ack . . . basic classroom materials, such as working markers, paper, and lab equipment for science classes[,]" they experience overcrowding "with as many as 40 students in a single classroom[,]" and there are "[r]ecurrent leaks in school hallways," and "no toilet paper in the bathroom." It is unclear from these general allegations whether the deficiencies extend to a few schools or are district-wide. Nor does the complaint provide any benchmarks from which to assess these allegations as the CFE I plaintiffs did by comparing access to supplies in New York City schools with schools statewide. While CFE I is not a minimum standard for Education Article complaints, it does demonstrate by comparison the complete failure to make the necessary showing in this otherwise lengthy complaint. The [*5]allegations here, which the Appellate Division held were "terse[], but adequate" (228 AD3d at 164), are neither and they cannot withstand a motion to dismiss.
Plaintiffs also fail to adequately allege that the education students receive at these unscreened schools is constitutionally deficient for the same reason we determined that the complaint in Paynter failed to state a cognizable Education Article claim—a lack of causation. Plaintiffs essentially argue that the negative educational outcomes experienced by Black and Latino students—lower graduation rates and conferral of advanced Regents diplomas —is the result of their relegation to "predominantly Black and Latinx" general educational programs, as opposed to the "predominantly white and Asian" Gifted & Talented programs or screened and specialized schools. As in Paynter, plaintiffs here do not assert "that these results are caused by any deficiency in teaching, facilities or instrumentalities of learning, or any lack of funding" (100 NY2d at 440)[FN5]. Aside from the conclusory allegations of input deficiencies already described, plaintiffs have failed to establish a causal connection between the deficient outputs and any failure of defendants "to provide resources—financial or otherwise" to the unscreened schools (NYCLU, 4 NY3d at 180 [internal quotation marks omitted]). They do not claim, for example, that their teachers are inexperienced or uncertified—benchmarks used in the CFE I complaint to measure teacher quality—nor do they allege that the curriculum currently in place is not "reasonably up-to-date" in terms of "reading, writing, mathematics, science, and social studies" (CFE I, 86 NY2d at 317). As we made clear in Paynter, "allegations of academic failure alone, without allegations that the State somehow fails in its obligation to provide minimally acceptable educational services, are insufficient to state a cause of action under the Education Article" (100 NY2d at 441).
Finally, plaintiffs' novel input allegations regarding curriculum content and diversity hiring practices are also incapable of supporting their Education Article claim. Plaintiffs ask the Court to recognize these inputs as indispensable to a sound basic education because they could help to "disrupt the complex system of biases and structural inequities" in society. The Appellate Division agreed, noting that "the State and City have acknowledged the importance of initiatives that enhance and encourage diversity, equity, and inclusion in the City's schools[,]" and concluded that such initiatives "provide some support for plaintiffs' claims" (228 AD3d at 164-165 & n 10). But even if we accept, as we must at this stage of the proceedings, that these inputs bear on education quality, which in turn affects outcomes for Black and Latino students, plaintiffs must still allege that the current system of education does not "meet minimum constitutional standards" (NYCLU, 4 NY3d at 178), which requires only that defendants "put . . . adequate resources into the classroom" (Paynter, 100 NY2d at 441). As laudable as the aspirations in the complaint may be, the standards plaintiffs propose "exceed notions of a minimally adequate or sound basic education" and may not be used "as benchmarks of educational adequacy" under the Education Article (CFE I, 86 NY2d at 317). As the Appellate Division acknowledged, "[n]o court has yet found that such inputs are necessary for a sound basic education" (228 AD3d at 164), and plaintiffs have offered nothing to support the proposition that "disrupt[ing] the complex system of biases and structural inequities in society" through culturally sensitive curricula or faculty is a component of the Constitution's guarantee of a sound basic education. At [*6]best, plaintiffs' novel input allegations represent a policy disagreement rather than a "gross and glaring inadequacy" in the education being provided (see Levittown, 57 NY2d at 48).
Accordingly, as plaintiffs have failed to adequately plead that they were denied a sound basic education, the claim must be dismissed.[FN6]
B.
Plaintiffs claim that defendants' admissions policies violate the State Equal Protection Clause because the standardized testing policies affect Black and Latino students more negatively and, according to the complaint, defendants "intentionally maintain and sanction this system despite their knowledge" of these disparate outcomes. As with their Education Article claim, the allegations supporting their Equal Protection Claim are insufficient as a matter of law.
The New York State Equal Protection Clause provides that "[n]o person shall be denied the equal protection of the laws of this state" and "[n]o person shall, because of race . . . be subjected to any discrimination in their civil rights . . . by the state or any agency or subdivision of the state" (NY Const, art I, § 11). We have stated that this clause "is coextensive with the rights protected under the Federal Equal Protection Clause" (Myers v Schneiderman, 30 NY3d 1, 13 [2017] [internal citation omitted]) and plaintiffs raise no argument here that it should be interpreted differently as a matter of state constitutional law.
To state an Equal Protection claim based on disproportionate impact of a facially neutral action or policy, a plaintiff must show "[p]roof of racially discriminatory intent or purpose" (Village of Arlington Heights v Metropolitan Housing Development Corp., 429 US 252, 265 [1977]; see CFE I, 86 NY2d at 321 [recognizing that "an equal protection cause of action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination"]). Determining intent "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" (id. at 266). While the disproportionate impact of an action "may provide an important starting point" (id.), it is well-established that such impact, even if "foreseeable and anticipated," "without more, do[es] not establish a constitutional violation" (Columbus Bd. of Educ. v Penick, 443 US 449, 464 [1979]). For this reason, "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system[,] is one factor among many others which may be considered by a court" in determining discriminatory intent, but without additional proof is insufficient to establish an equal protection violation (id. at 464-465 [internal quotation marks and citation omitted]). Courts must also look to other evidence, which may include "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up to the challenged decision[,]" and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decision-making body" (Arlington Heights, 429 US at 266-268 [internal citations omitted]). Here, the Appellate Division concluded that, although the allegations were "thin" and the Court considered it a "close question," the equal protection claim was sufficiently pleaded (228 AD3d at 169). We disagree.
The allegations of discriminatory intent identified fall into three categories: disparate impact, knowledge of that disparate impact, and the legislative history of the 1971 Hecht-Calandra Act (L 1971, ch 1212) (HCA), which mandated an admissions test for certain specialized high schools in New York City. The complaint alleges that the impact of the standardized testing policies bears more heavily on Black and Latino students when compared to white and Asian students and that the disproportionate impact is foreseeable. For the 2017-18 school year, for example, plaintiffs allege that Black and Latino students were significantly underrepresented in the Gifted & Talented program, with Black and Latino students [*7]"receiv[ing] only 18 percent of G & T program offers" despite comprising "65 percent of kindergartners" in New York City public schools, whereas "Asian and white students comprised 18 and 17 percent of the kindergarten population . . . but received 42 and 39 percent of G & T program offers." Plaintiffs also cite a 2020 analysis of admissions to "27 of the City's top-performing screened (not specialized) high schools[,]" which found that "[w]hite and Asian students were admitted at almost double the rates of Black and Latino students." Plaintiffs also allege that in that same year, Black and Latino students received only a handful of offers to Stuyvesant high school, one of the City's specialized high schools.
With respect to the required element of intentional discrimination, allegations of disparate impact and foreseeability, standing alone, are insufficient to survive a motion to dismiss even where refusal to act in response to that impact is alleged (see CFE I, 86 NY2d at 321). In CFE I, we dismissed the plaintiffs' equal protection claim where the complaint made similar allegations of disparate impact, knowledge of that impact, and failure to address those known and foreseeable consequences (id. at 352-353 [Smith, J., dissenting from equal protection holding], quoting complaint in CFE I, 86 NY2d 307 [1995], available at 1993 WL 13159629 [noting the allegation in the complaint that " 'despite knowledge' of these impacts and " 'despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have reenacted the inequitable state aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students' "]). By comparison, in two of the cases cited by the Appellate Division, additional evidence of intent was provided by allegations of "affirmative acts" such as the implementation of "segregation-enhancing school zone realignments, race-based staff assignments, race-based placement of minorities in special classes" and "race-based decisions on school openings and closings" (United States v Yonkers Bd. of Educ., 837 F2d 1181, 1227 [2d Cir 1987]), and implementation of discriminatory policies, including a "general practice of assigning black teachers only to those schools with substantial black student populations," and "the intentionally segregative use of optional attendance zones, discontiguous attendance areas, and boundary changes" (Columbus, at 461-463; see 228 AD3d at 170). To make out an equal protection violation, plaintiffs' claim of intent must therefore be grounded in the passage of the HCA.
We disagree with the Appellate Division's conclusion that the "legislative history of the Hecht-Calandra Act, the timing of its enactment," and certain statements in the legislative history "support an inference of segregative intent" (228 AD3d at 169-170). The HCA provides that admission to the three specialized high schools then in operation and to "such similar further special high schools which may be established shall be [determined] solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York" (L 1971, ch 1212, § 1; Education Law § 2590-h [1] [b])[FN7]. It also permits those schools "to maintain a discovery program to give disadvantaged students of demonstrated high potential an opportunity to" attend if they meet certain criteria (id.). The goal of the HCA was to "preserve the[] specialized high schools where excellence is the criteria" for admission (Senate Introducer's Mem in Support, Bill Jacket, L 1971, ch 1212 at 7).
On its face, the statute contains no requirement that a specific test be administered but requires only an examination that objectively assesses scholastic achievement. Plaintiffs do not allege that the City could use a test that objectively assesses scholastic achievement equally well but with less adverse impact. Nevertheless, the complaint speculates that more than a half century ago, the HCA was "enacted to thwart the City's investigation of the test's potential bias against Black and Puerto Rican students" that was being conducted by the Chancellor of New York City public schools. As evidence of intent, the complaint points to a letter in the bill jacket written by Mayor John Lindsay to Governor Nelson Rockefeller recommending [*8]that the legislature disapprove of the bill until the committee investigating the potential discriminatory nature of the proposed admissions test completed its report, and a letter from the City's Board of Education opposing the bill for the same reason (Letter from Mayor, Bill Jacket, L 1971, ch 1212 at 21-22; Board of Education, Mem in Opposition, Bill Jacket, L 1971, ch 1212 at 29-30). At most, this history suggests that the HCA was passed with knowledge of, or "in spite of," the adverse effects that the version of the test then being administered had upon an identifiable group (see e.g. Personnel Adm'r of Massachusetts v Feeney, 442 US 256, 279 [1979] [internal quotation marks and citation omitted]). But there is no evidence that it was passed with the intent to exclude certain minorities from specialized high schools (id. [internal quotation marks and citation omitted]). Notably, the legislative history shows that there were successful efforts to help reduce potential discriminatory effects, such as removing the original draft's percentage limitation on admission to the Discovery program (see Senate Introducer's Mem in Support, Bill Jacket, L 1971, ch 1212 at 3). Ultimately, the allegations of foreseeable disparate impact and the fragments of legislative history showing awareness of the disparate impact of the test that was administered in 1971, are insufficient to establish discriminatory intent and plaintiffs' equal protection claim must be dismissed.
C.
Plaintiffs' third cause of action alleges a violation of the NYSHRL's provision making it "an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race . . . " (Executive Law § 296 [4]). The complaint here alleges that "multiple members" of the organizational plaintiffs "are academically qualified to succeed at a specialized high school; and have been deterred from applying to, or been rejected from, a specialized high school due to the [Specialized High School Admissions Test]." The complaint makes similar claims relating to "screened middle or high schools" and identifies an individual plaintiff who "applied to several high schools and was rejected by all of them."[FN8]
The Appellate Division held that "plaintiffs sufficiently allege that they were denied access to the City's facilities 'by reason of [their] race' " although they were " 'otherwise qualified' for admission" based on their allegations of discriminatory intent and, intent aside, based on a disparate impact theory (228 AD3d at 173-174). Initially, we disagree that plaintiffs sufficiently allege discriminatory intent (see Equal Protection claim, supra at 17-19). Assuming, without deciding, that disparate educational outcomes alone could in some circumstances sustain such a claim, an issue we need not and do not reach today, plaintiff's complaint fails to include allegations by individual students who were denied admission to a particular school or school program by an identified screening mechanism that is alleged to have a disparate impact, or that a specific screening mechanism lacks validity in predicting the ability of students to thrive in the curriculum offered at any particular screened school. Instead, the Appellate Division relied on plaintiffs' conclusory allegation that "but for the discriminatory admissions testing," Black and Latino students "would not have been excluded" (id.). This legal conclusion—namely that certain unnamed members of the plaintiff organizations were "excluded" based on the alleged "discriminatory" testing process—is insufficient even under the liberal standard applied on a motion to dismiss (see Martinez, 84 NY2d at 87).
* * *
We share the concerns of the lower courts and the parties over the issues raised by plaintiffs' complaint, and we acknowledge the ongoing efforts in other settings involving elected officials, school [*9]boards, parents, and students, among others, to address the disparities that plaintiffs identify [FN9]. Our role, however, is—as it has always been—to determine whether plaintiffs have presented a legally sufficient claim for resolution by the courts (compare CFE I, 86 NY2d 307; CFE II, 100 NY2d 893; Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14 [2006]; Aristy-Farer, 29 NY3d 501, with Paynter, 100 NY2d 434; NYCLU, 4 NY3d 175). Here, as in Paynter and NYCLU, plaintiffs have not done so, and we must dismiss.
Accordingly, the order of the Appellate Division insofar as appealed from should be modified, without costs, in accordance with this opinion and, as so modified, affirmed, and the certified question answered in the negative.

RIVERA, J. (dissenting):

Plaintiffs' allegations make out an utterly pathetic picture of public education for New York City's Black and Latino schoolchildren. Plaintiffs assert that the City's public education system is among the most racially segregated in the country, and that it functions as a pipeline that tracks Black and Latino students into inferior schools and substandard programs. According to plaintiffs, by design, defendants' policies and practices deny these students access on the basis of race, ethnicity, and economic status to the facilities and training necessary to compete on a level playing field with their White peers for academic and employment opportunities. Plaintiffs also claim that the public education system does not prepare students of color to participate fully in contemporary society, as it denies them the opportunity to learn how to engage critically within their communities on political and social issues. As a result, the public education system sends a message, internalized over time, that society does not value Black and Latino students. In other words, the public education system stamps these students with a badge of inferiority that stays with them for their entire lives.
Plaintiffs support these claims with factual assertions, based on State and City governmental reports, statistics, social science research, and the plaintiffs' experiences, that: 1. the public education system perpetuates and enhances the City's racial and economic segregation; 2. the school buildings are decrepit and some are vermin-infested; 3. classrooms are overcrowded and lack basic supplies and equipment; 4. textbooks are out of date and understocked; 5. the public education system tracks students of color by race and ethnicity into underachieving and neglected schools and subpar academic programs; 6. the adoption and continued use of unvalidated standardized screening tests has led to access disparities based on race and economic status in specialized schools; 7. teachers and leadership staff in schools do not reflect the [*10]demographics of the student body and the City; and 8. teachers are inadequately trained to address the academic needs and social realities of a diverse student body. According to plaintiffs, this two-tiered education system denies Black and Latino students the opportunities necessary to prepare them to critically engage in New York's richly diverse civic life as active participants in our democracy and to meaningfully compete for living-wage jobs in our modern society.
Under our liberal pleading standards—not the heightened standard adopted by the majority—plaintiffs have sufficiently pleaded causes of action for constitutional violations of the State Education Article and Equal Protection Clause, and a violation of the New York State Human Rights Law. Indeed, the entrenched segregated education system plaintiffs describe has no place in our society. Therefore, the Appellate Division correctly determined that plaintiffs should be permitted to proceed with their claims, and I would affirm.
I.
Plaintiffs' Allegations that New York City Public Schools Entrench a Racial and Ethnic Hierarchy through Segregated Substandard Facilities, Academically Deficient Instruction, and Inadequate Staff Training
A.
The individual plaintiffs are City public school students who identify as Black or of Puerto Rican, Dominican, Mexican, Vietnamese, Trinidadian, Turkish, or Bengali descent, and some are recent immigrants. The organizational plaintiffs are IntegrateNYC, Inc., a youth-led nonprofit membership corporation; Parents for Change at P.S. 132, an organization of parents and guardians of Public School 132 students; and the New York City Coalition for Educational Justice (CEJ), a citywide coalition of community-based organizations whose members include the parents of racially and ethnically diverse City public school students. The organizational plaintiffs' mission, broadly described, is to end racial inequality and promote educational equity in the public school system. Several of the organizational plaintiffs' student members aspire to attend a "screened middle or high school," which plaintiffs explain are schools that admit students based on selective academic criteria, often relying, at least in part, on standardized test scores. By contrast, an "unscreened school" has no selective academic requirements. Several of the organizations' student members also aspire to attend a "specialized high school," which plaintiffs define as the "eight elite schools for which admission is based [solely] on [a] rank-order score on a single standardized test, the Specialized High Schools Admissions Test (SHSAT)." Defendants are the State and City of New York, State and City governmental entities, and State and City officers charged with creating and maintaining the City's public school system.[FN1]
Plaintiffs' operative complaint does not mince words. It alleges that the public education system is racially and ethnically segregated, and that it tracks students of color, in particular Black and Latino students, into unsafe facilities and pedagogically unsound programs. The pleading summarizes the education system's alleged inequities and their illegal results, asserting that "New York City's public education system is suffused with and perpetuates . . . various forms of racism, in ways blatant or subtle, intended or willfully ignored and tolerated." It does so by: 1. "[m]aintaining a racialized pipeline to the City's prime educational opportunities, including its Gifted & Talented (G & T) programs and screened middle and high schools, that excludes many students of color, who are instead condemned to neglected schools that deliver inferior and unacceptable outcomes"; 2. "[a]llowing schools to teach a Eurocentric curriculum that centers White experience, marginalizing the experiences and contributions of people of color"; 3. "[f]ailing to recruit, retain, and support a racially diverse educator workforce to provide challenging and empathic instruction to all students"; and 4. "[f]ailing to provide sufficient training, support, [*11]and resources to enable administrators, teachers, and students to identify and dismantle racism." Plaintiffs allege that "[i]ndividually and collectively, these policies and practices . . . cause the denial of a sound basic education to New York City schoolchildren." The outcomes of defendants' conduct—"the systematic exclusion of students of color from adequate, much less prime, educational opportunities and the resulting denial of social and economic mobility; . . . and the continued subordination of racially marginalized communities—contravene New York law and subvert the core principles of American democracy and the purposes of the State educational system."
Plaintiffs claim that the public education system, as described, causes the subjugation of Black and Latino students. They assert that the City's public schools are "[a]n education system that reproduces, validates, and even exacerbates the artificial racial hierarchies that have long structured civic, commercial, and social life in the United States," and that the schools thereby "cannot prepare . . . students [of color] for meaningful democratic and economic participation in today's diverse society." According to plaintiffs, "if government's goal were to create a system of education that would replicate and in fact exacerbate pernicious racial inequality in the City, it would be challenging to design a more effective system than that which currently exists."
Plaintiffs assert three causes of action. First, plaintiffs claim that the public education system violates the State Constitution's Education Article because it fails to provide the plaintiff students and other City public school children with a sound basic education. Second, plaintiffs allege that defendants violated the State Constitution's Equal Protection Clause by creating and maintaining an educational caste system that cements racial inequality and denies Black and Latino students equal access to the resources and programming afforded to other students. Third, plaintiffs assert that defendants' policies and practices violate the New York State Human Rights Law (NYSHRL) prohibition on discrimination in education facilities. Plaintiffs aver that defendants' policies and practices have maintained a segregated education system that relegates students of color to neglected schools and inferior educational opportunities. Further, plaintiffs claim that defendants employ admissions policies and practices, including standardized tests, that have a disparate impact on students of color, and thus "deny[ ] them access to facilities to which they have an equal right."
B.
Plaintiffs' pleading relies on government reports, statistics, social science research, media publications, and legislative history, as well as the findings and observations of more than ten plaintiffs' experts—researchers and scholars in the fields of education, psychology, sociology, and psychometrics. Based on these sources, the pleading states the following facts in support of plaintiffs' claims:

 • City public schools are among the most racially segregated in the country: during the 2018-2019 school year, nearly 75 percent of Black and Latino students attended schools with less than ten percent White students, and over 34 percent of White students attended schools with majority White populations, even though only 15 percent of City students are White;

• The public educational system compounds the City's existing racial segregation: City public schools are consistently less diverse than the neighborhoods in which they are located, even though most City elementary schools are zoned schools, which give priority to students who live in the neighborhood in which the school is located (see Citizens' Committee for Children of New York, Back to School Part 2: Do NYC Schools Represent their Districts? [Jan. 7, 2020], available at https://cccnewyork.org/back-to-school-part-2-do-nyc-schools-represent-their-districts/ [accessed Oct. 7, 2025];[FN2] School Diversity Advisory Group, Making the Grade: The Path to Real Integration and [*12]Equity for NYC Public School Students, at 68-69 [Feb. 2019], available at https://cdn.givingcompass.org/wp-content/uploads/2019/02/22123200/1c478c_4de7a85cae884c53a8d48750e0858172.pdf [accessed Oct. 7, 2025]; New York Appleseed, Within Our Reach - Segregation in NYC District Elementary Schools and What We Can Do About It, [2020], available at https://www.nyappleseed.org/post/within-our-reach-2020 [accessed Oct. 7, 2025]);

 • Racial and economic disparities are exacerbated early on for young elementary school students: G & T classrooms are often more homogenous than general education classrooms and more likely to exclude Black and Latino students and the economically disadvantaged altogether;

• Between 2008 and 2020, the City allocated places in G & T programs based on students' scores on a single standardized test, available to students entering kindergarten through third grade—which, according to plaintiffs' expert Dr. Allison Roda, the City has never demonstrated is pedagogically sound [FN3]—and such practices worsen and perpetuate racial disparities within G & T programs;[FN4]

 • Using standardized tests as a measure of "giftedness" creates a self-fulfilling feedback loop for privileged families where "students coming from high [socioeconomic status] homes are likely to have [meaningful educational] opportunities, which are likely to contribute to the fruition of their [*13]giftedness" (Donna Y. Ford, Culturally and Linguistically Diverse Students in Gifted Education: Recruitment and Retention Issues, 74 Exceptional Children 289, 298 [Apr. 2008]);
• Plaintiffs' expert Dr. Pedro Noguera observes that sorting students along racial lines into G & T programs sends a message of inferiority to students of color that tends to be self-reinforcing over time, as students internalize the labels assigned to them and consequently experience worse behavioral and academic outcomes (see Pedro A. Noguera, The Trouble With Black Boys: . . . And Other Reflections on Race, Equity, and the Future of Public Education [2009]). Other researchers have similarly found that students of color keenly perceive the unspoken messages of racial tracking and come to understand social and academic privileges as primarily the property of White students (see Joy Howard, The White Kid Can Do Whatever He Wants: The Racial Socialization of a Gifted Education Program, 54 Educ Studies 553, 563 [Apr. 2018]);

• Diverse classrooms confer academic and social benefits on all students, including White students, because they facilitate learning across differences, which promotes creativity, motivation, deeper learning, critical thinking, and problem-solving skills (Amy S. Wells, How Racially Diverse Schools and Classrooms Can Benefit All Students, The Century Foundation, at 14 [Feb. 2016], available at https://tcf.org/content/report/how-racially-diverse-schools-and-classrooms-can-benefit-all-students/ [accessed Oct. 7, 2025]; School Diversity Advisory Group, Making the Grade: The Path to Real Integration and Equity for NYC Public School Students, at 68-69 [Feb. 2019], available at https://cdn.givingcompass.org/wp-content/uploads/2019/02/22123200/1c478c_4de7a85cae884c53a8d48750e0858172.pdf [accessed Oct. 7, 2025]);

 • Defendants fail to provide the diverse classrooms, diverse teaching staff, and culturally responsive curricula necessary to prepare students of color to redress the immensely complex "public problems confronting the rising generation" (Campaign for Fiscal Equity v State of New York, 100 NY2d 893, 905 [2003] [internal quotation marks and citation omitted]);

• The City's racialized education pipeline extends school segregation into middle and high schools. Screened middle and high schools are particularly unrepresentative of the populations of their districts as compared to unscreened schools (see Citizens' Committee for Children of New York, Back to School Part 2: Do NYC Schools Represent their Districts? [Jan. 7, 2020], available at https://cccnewyork.org/back-to-school-part-2-do-nyc-schools-represent-their-districts/ [accessed Oct. 7, 2025] [reporting that during the 2018-2019 school year 58 percent of screened middle schools, 53 percent of screened high schools, 33 percent of unscreened high schools, and 27 percent of unscreened middle schools were unrepresentative]),[FN5] and specialized high schools are not even remotely representative of the City's schoolchildren, but instead have increasingly come to resemble an apartheid state;

 • Admission to the City's eight specialized high schools is based solely on a student's SHSAT score, despite widespread consensus among psychometricians, including plaintiffs' experts Dr. Ezekiel Dixon-Román and Dr. Howard Everson, that standardized test scores should not be the sole factor in allocating admissions offers to elite schools. As a result of this admissions criteria, specialized high schools are among the most starkly segregated schools in the City;[FN6]

• Professional education research decries using test scores as the sole basis for specialized educational programming (see American Educational Research Association, Standards for Educational and Psychological Testing, at 187 [2014], available at https://www.testingstandards.net/uploads/7/6/6/4/76643089/9780935302356.pdf [accessed Oct. 8, 2025] ["Test scores alone should never be used as the sole basis for including . . . or excluding any student from" specialized educational programming]; see id. at 198 ["In educational settings, a decision or characterization that will have major impact on a student should take into consideration not just scores from a single test but other relevant information"]);

 • The use of the SHSAT for admission to the City's specialized high schools is expressly mandated by the 1971 Hecht-Calandra Act, which was passed by the State Legislature five decades ago to stymie the schools Chancellor's efforts to commission a special study to investigate whether the test, as it then existed, was culturally biased, leading to public criticism that the law sought "to guard against increased numbers of [B]lack[ ] and Puerto Rican[ ]" students in the specialized high schools;[FN7]

• Mayor John Lindsay opposed the Hecht-Calandra Act on the express grounds that "[i]t has been alleged that the competitive method for ascertaining admission to these schools discriminates against Black and Puerto Rican applicants," and that the Legislature should only enact reforms after completion of the Chancellor's committee report addressing whether the test discriminates against [*14]Black and Puerto Rican students (see Letter from Mayor Lindsay to Governor Rockefeller, June 14, 1971, Bill Jacket, L 1971, ch 1212 at 21);[FN8]

 • In the more than 50 years since the passage of the Act, the City and State have never assessed whether the SHSAT is culturally biased, nor have they ever undertaken comprehensive validity testing of the SHSAT based on accepted professional standards,[FN9] even though "[v]alidity is . . . the most fundamental consideration in developing . . . and evaluating tests" and "[e]vidence of the validity of a given interpretation of test scores for a specified use is a necessary condition for the justifiable use of the test" (American Educational Research Association, Standards for Educational and Psychological Testing, at 11 [2014], available at https://www.testingstandards.net/uploads/7/6/6/4/76643089/9780935302356.pdf [accessed Oct. 8, 2025]);

• The City hired a private consulting firm to assess the validity of the SHSAT in 2013, but that study failed to assess bias, equity, and fairness in the test. Standardized testing research demonstrates that this assessment of the SHSAT's validity does not comport with accepted professional standards for validity testing (see American Educational Research Association, Standards for Educational and Psychological Testing, at 49-50 [2014], available at https://www.testingstandards.net/uploads/7/6/6/4/76643089/9780935302356.pdf [accessed Oct. 8, 2025]). Additionally, while the City transitioned to a redesigned SHSAT in 2017, it did so without publishing any evidence of the redesigned test's validity;

 • Testing experts, including plaintiffs' expert Dr. Howard Everson, recognize not only the need to demonstrate the validity of standardized tests, but also the heightened need for robust, peer-reviewed, and repeated validity studies where a single, high-stakes admissions test is at issue;

• Plaintiffs' experts Dr. Ezekiel Dixon-Román and Dr. Howard Everson explain that "standardized tests are neither designed nor intended to select students for specialized academic programs (the way they are utilized in admissions screens)." In addition, plaintiffs' expert Dr. David E. Kirkland [*15]observes that the use of standardized tests "disadvantages Black and Latinx students, who face culturally biased test language and tasks";

 • Even certain programs intended to address disparities in access to specialized high schools nonetheless revolve around the SHSAT. For example, plaintiffs allege that candidates are identified for the Discovery program—which allows a limited number of students of low socioeconomic status to gain admission to specialized high schools after enrolling in a summer enrichment program—based on their proximity to the SHSAT cutoff scores;
• Plaintiffs IntegrateNYC and CEJ have multiple members who are, or whose children are, Black, Latino, Afro-Latino, or Asian City public school students who aspire to attend a specialized high school or a screened middle or high school, and are qualified for such schools, but have been deterred from applying to, or have been rejected from, those schools due to the standardized tests;
• Through specialized education programs such as G & T classrooms, screened middle and high schools, and specialized high schools, the State and City have sanctioned and employed admissions criteria relying on standardized testing, resulting in a profound disparate impact that discriminates against students of color by denying them access to facilities to which they have equal right;

• Across the City public school system, students of color are consistently and disproportionately relegated to schools with substandard conditions, including overcrowded classrooms; shoddy and insufficient numbers of textbooks; dilapidated or missing basic classroom materials, including working markers, paper, and laboratory equipment for science classes; limited academic and extracurricular opportunities; and unsanitary and poorly maintained buildings, some of which are former factories or close in proximity to major highways, and which experience recurrent leaks, lack toilet paper in bathrooms, or are infested with vermin;
• As one example of a school with substandard conditions, plaintiffs describe Renaissance High School for Musical Theater and the Arts, located on the campus of Herbert H. Lehman High School in the Bronx. The school building abuts and extends over the Hutchinson River Parkway, with one wing built atop a bridge crossing the parkway, exposing students to high levels of vehicle pollution and leading students to struggle to focus and hear one another in class over the constant din of passing cars and trucks. The cafeteria is a windowless space in the basement, and many classrooms have no windows at all. Students frequently encounter vermin, including rats and cockroaches, in classrooms and hallways;

• Students of color rarely recognize themselves in the curriculum used in the City public school system because it excludes or only superficially includes the histories, achievements, and voices of historically marginalized people of color;

 • Education experts agree that a curriculum that reflects students' identities, experiences, families, and communities enhances students' academic performance, increases their engagement with their coursework, and strengthens their self-image and their perceptions of their capacity to succeed and [*16]make positive change (see Brittany Aronson & Judson Laughter, The Theory and Practice of Culturally Relevant Education: A Synthesis of Research Across Content Areas, 86 Rev Educ Research 163 [Mar. 2016]);
• Plaintiffs' expert Dr. Mariana Souto-Manning further explains that implementing culturally responsive pedagogies "foment[s] critical consciousness" and "develop[s] young children as active civic participants who critically read the injustices that characterize their lives and worlds, and actively work to problematize, challenge, and change them" (Mariana Souto-Manning & Ayesha Rabadi-Raol, (Re)Centering Quality in Early Childhood Education: Toward Intersectional Justice for Minoritized Children, 42 Rev Educ Research 203, 214 [Mar. 2018]);
• Teachers and leadership staff in schools do not reflect the demographics of the City's student body. For example, during the 2019-2020 school year, over 56 percent of City teachers were White (New York City Department of Education, 2019 — 2020 School Year Local Law 226 Report for the Demographics of School Staff — Ethnicity [Dec. 2020], available at https://data.cityofnewyork.us/Education/2019-2020-School-Year-Local-Law-226-Report-for-the/2jg5-6hqv/about_data [accessed Oct. 8, 2025]);

• The State Department of Education recognizes that "[a] diverse teacher workforce benefits all students," both because of the "[r]ole model effect[,] [whereby] students see people of color in professional roles and positions of authority," and because educational disparities are linked to students of color holding "negative perceptions of schools due to . . . [the] absence of teachers from similar backgrounds" (New York State Education Department, NYSED Educator Diversity Briefing on Draft Report, at 5, 16 [Nov. 2019], available at https://www.regents.nysed.gov/sites/regents/files/HE%20-%20NYSED%20Educator%20Diversity%20.pdf [accessed Oct. 8, 2025]; see also Hua-Yu Sebastian Cherng & Peter F. Halpin, The Importance of Minority Teachers: Student Perceptions of Minority Versus White Teachers, 45 Educ Researcher 407, 407-420 [Oct. 2016]);

 • The State Department of Education's Culturally Responsive-Sustaining Education Framework states that teachers must be provided resources to enable them to "plan and implement culturally responsive-sustaining practices in their respective communities" (New York State Education Department, Culturally Responsive-Sustaining Education Framework, at 53 [2019], available at https://www.nysed.gov/sites/default/files/programs/crs/culturally-responsive-sustaining-education-framework.pdf [accessed Oct. 8, 2025]);

• The City and State fail to provide teachers with the training, curriculum, and resources they need to deliver culturally responsive instruction;

 • The City's graduation rates also reflect the education system's racial disparities. In 2020, the graduation rate for Black students was 75.9 percent, nearly eight percentage points lower than that of [*17]White students. Latino students graduated at an even lower rate—74.1 percent, or close to 10 percentage points below White students;[FN10]

• These disparities are even more pronounced among advanced Regents diploma recipients: in 2018, 50 percent of Asian students and 35 percent of White students earned advanced Regents diplomas, as compared to only eight percent of Black students and 12 percent of Hispanic students. Advanced Regents diplomas are considered a virtual key to the top colleges and universities;

 • The egregious racial inequality of the City's public school system has long been publicly documented and decried, including by defendants themselves, yet the City and State have failed to take sufficient action and instead intentionally maintain and sanction the educational system despite their knowledge that it reproduces and further entrenches the City's existing racial hierarchy; and

• An educational system that segregates large swaths of students of color from their White peers, cements different and superior outcomes for White students, marks students of color with badges of inferiority, infrequently exposes students to adults of color in positions of power and stature, and presents students with a curriculum steeped in Eurocentrism and divorced from the modern, multiethnic City and world in which they live leaves students unfit to engage in meaningful civic and economic participation.
II.
Supreme Court granted defendants' respective motions to dismiss on the ground that the pleading was nonjusticiable. The Appellate Division unanimously modified on the law (228 AD3d 152, 157, 174 [1st Dept 2024]). After concluding that plaintiffs' claims were justiciable, the Appellate Division held that the pleading sufficiently alleged cognizable claims under the Education Article, the State Equal Protection Clause with respect to the G & T test, the SHSAT, and other standardized tests used in screened middle and high schools, and the NYSHRL solely as against the City defendants based on denial of the use of their facilities (id. at 161-174).
The majority and I agree that the claims are justiciable (majority op at 4 n 2), and that deficient funding is not the only cause capable of supporting an Education Article claim (id. at 7). That is as far as my agreement with the majority goes.
As I discuss, infra, the pleading is legally sufficient because: 1. the sound basic education standard we have adopted for Education Article claims is intended to address the needs of a changing society; 2. that standard cannot be satisfied by an educational system that functions as a racialized pipeline excluding students of color from schools and programs indispensable to developing the skills necessary for meaningful civic participation and accessing the employment opportunities available to their White peers; 3. plaintiffs' equal protection claims sufficiently plead discriminatory intent when viewed against the historical backdrop of the Hecht-Calandra Act and the actions of government officials, including inadequate remedial efforts, which allegedly result in racial and ethnic disparities caused by unvalidated standardized tests; and 4. plaintiffs' NYSHRL claim is sufficiently pleaded against the City defendants based on plaintiffs' disparate impact allegations that otherwise qualified students are denied access to public education facilities.
III.
Pleading Standard
"In considering the sufficiency of a pleading subject to a motion to dismiss for failure to state a cause of action under [CPLR 3211 (a) (7)], our well-settled task is to determine whether, accepting as true the factual averments of the complaint, plaintiff[s] can succeed upon any reasonable view of the facts stated" (Aristy-Farer v State, 29 NY3d 501, 509 [2017], quoting Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 318 [1995] [CFE I] [internal quotation marks and citation omitted]). "On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction" and we must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Eccles v Shamrock Capital Advisors, LLC, 42 NY3d 321, 342 [2024] [same]; see also Foley v D'Agostino, 21 AD2d 60, 64-65 [1st Dept 1964] ["(E)very pleading question should be approached in the light of (CPLR 3026's statements) that pleadings shall be liberally construed" and that "(d)efects shall be ignored if a substantial right of a party is not prejudiced"] [internal quotation marks omitted]; Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977] ["Initially, the sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law"]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]; Eccles, 42 NY3d at 343; see also Lam v Weiss, 219 AD3d 713, 715 [2d Dept 2023] ["Whether the complaint will later survive a motion for summary judgment, or whether the plaintiff will ultimately be able to prove its claims, of course, plays no part in the determination of a prediscovery CPLR 3211 motion to dismiss"] [internal quotation marks and citation omitted]).
We have repeatedly "recognized the right of plaintiffs 'to seek redress[ ] and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint' " (CFE I, 86 NY2d at 318, quoting Armstrong v Simon & Schuster, 85 NY2d 373, 397 [1995]). So long as "we determine that plaintiffs are entitled to relief on any reasonable view of the facts stated, our inquiry is complete and we must declare the complaint legally sufficient" (id.). In short, our task is to determine sufficiency alone, "without expressing our opinion as to whether [plaintiffs] can ultimately establish the truth of their allegations before the trier of fact" (id. [internal citations omitted]).
To the extent the majority suggests that the complaint is poorly drafted (see majority op at 5 n 4, 11-12), I disagree, but regardless, nonsubstantive drafting flaws are no basis to dismiss a pleading and are of no import when the minimal pleading standard is satisfied and a cognizable cause of action may be gleaned from the express language of the complaint and the reasonable inferences to be drawn in the plaintiffs' favor therefrom (Kain v Larkin, 141 NY 144, 150-151 [1894] ["The pleading may be deficient in technical language or in logical statement(,) but . . . (it) will be deemed to allege whatever can be imputed from its statements by fair and reasonable intendment"]). At this preliminary stage in the proceedings, we must "sustain the pleading when a cause of action may be discerned, even if inartfully stated, and [we should] make no effort to evaluate the ultimate merits of the case" (Fischbach & Moore v Howell Co., 240 AD2d 157, 157 [1st Dept 1997] [emphasis added]).[FN11] Indeed, "[l]ooseness, verbosity[,] and excursiveness, must be [*18]overlooked on . . . a motion [to dismiss] if any cause of action can be spelled out from the four corners of the pleading" (Foley, 21 AD2d at 64-65, citing David D. Siegel, A Biannual Survey of New York Practice, 38 St. John's L Rev 190, 205 [1963]).[FN12] Legal commentators have similarly noted that a complaint's inartful drafting and verbosity is no basis for dismissal (see Siegel, 38 St. John's L Rev at 205; Siegel, NY Prac § 208 [6th ed 2024]).
The burden is on defendants, as the movants, to establish that the pleading fails to articulate a viable claim (Connolly v Long Is. Power Auth., 30 NY3d 719, 728 [2018]; Jacobson v Chase Bank, 34 Misc 3d 38, 41-42 [App Term, 2d Dept, 9th & 10th Jud Dists 2011]). This is a heavy burden (cf. Leon, 84 NY2d at 87-88; Tax Equity Now NY LLC v City of New York, 42 NY3d 1, 12 [2024]), which defendants cannot establish merely because a complaint is poorly drafted, prolix, or provocative. Nor does a pleading's academic tone or its assertion of a novel legal theory render it deficient at this early stage of litigation. What matters is whether the factual allegations and all inferences in favor of the plaintiff assert a cognizable cause of action. I conclude defendants have failed to carry their burden of establishing that the pleading fails to allege any cognizable cause of action.
IV.
Education Article Cause of Action
A.
The State Constitution's Education Article mandates that "[t]he [L]egislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1). The language of the Education Article is not aspirational but rather establishes a constitutional floor for a legislative duty "to offer all [New York's] children the opportunity of a sound basic education" (CFE I, 86 NY2d at 316). The constitutional standard "defines the contours of the requirement, against which the facts of a case may then be measured" (Campaign for Fiscal Equity v State of New York, 100 NY2d 893, 931 [2003] [CFE II]).
In CFE I, the Court provided "a template reflecting [its] judgment of what the trier of fact must consider in determining whether defendants have met their constitutional obligation" (86 NY2d at 317-318). That template is not static, but dynamic (CFE II, 100 NY2d at 931). The first iteration of the template set forth the essentials of a sound basic education:
"Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (CFE I, 86 NY2d at 316).
In short, a sound basic education "consist[s] of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (id.). The Court chose as benchmarks of the educational mandate a person's ability to vote and serve [*19]on a jury "because they are the civic responsibilities par excellence . . . [and] the statutory requirements for participation in those activities are aimed at being inclusive" (CFE II, 100 NY2d at 906-907).
In CFE II—a subsequent appeal in the same CFE litigation—the Court acknowledged that mere skills acquisition fails to comport with the Education Article mandate; more is required (id. at 905-906). As the Court explained:
"[A] sound basic education conveys not merely skills, but skills fashioned to meet a practical goal: meaningful civic participation in contemporary society. This purposive orientation for schooling has been at the core of the Education Article since its enactment in 1984. As the Committee on Education reported at the time, the public problems confronting the rising generation will demand accurate knowledge and the highest development of reasoning power more than ever before" (id. at 905 [internal quotation marks and citation omitted]).
Taking into account contemporary demands, the CFE II Court further developed the template set out in CFE I to address a broader understanding of what is necessary "to function productively as [a] civic participant[ ]" in modern society (id. at 905-906). The Court recognized that a sound basic education must "prepare students to compete for jobs that enable them to support themselves," and that "for this purpose a high school level education is now all but indispensable" (id. at 906).
We have continued to acknowledge that "a sound basic education" must evolve to fit our ever-changing societal concepts of preparation for meaningful engagement in our democratic project (see Aristy-Farer, 29 NY3d at 505, quoting CFE II, 100 NY2d at 906, 908; see also CFE II, 100 NY2d at 931 [expanding the definition of "a sound basic education" to encompass "the opportunity for a meaningful high school education," even if "a sound basic education back in 1894, when the Education Article was added, may well have consisted of an eighth or ninth grade education"]). Simply put, "[t]he definition of a sound basic education must serve the future as well as the case now before us" (CFE II, 100 NY2d at 931).
B.
To adequately plead a violation of the Education Article, a plaintiff must satisfy a two-pronged burden. The plaintiff must first establish "deficient inputs—[in] teaching, facilities, and instrumentalities of learning—which lead to deficient outputs such as test results and graduation rates" (Paynter v State of New York, 100 NY2d 434, 440 [2003]; CFE II, 100 NY2d at 908). The existence of some differences in educational opportunities across schools is insufficient to establish a constitutional violation, as there must be a "gross and glaring inadequacy" (Paynter, 100 NY2d at 439, quoting Bd. of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 48 [1982] [Levittown]; CFE II, 100 NY2d at 914). The plaintiff must also demonstrate causation—that the deficient outputs are "causally connected" to the claimed input deficiencies (Paynter, 100 NY2d at 440). Evidence that improved inputs yield better student performance and results can establish causation (see CFE II, 100 NY2d at 919). "[T]here may be many causal links to a single outcome," and a plaintiff need not "search for a single cause of the failure of [the] schools" (id. at 920 [internal quotation marks and citations omitted]). In CFE I, plaintiffs supported their allegations "with fact-based claims of inadequacies"—in other words, "deficient inputs"—"in physical facilities, curricula, numbers of qualified teachers, [and] availability of textbooks[ ] [and] library books," and we concluded, "[o]n the basis of these factual allegations, and the inferences to be drawn therefrom," that plaintiffs "properly stated a cause of action sufficient to survive a motion to dismiss" (86 NY3d at 319).
C.
Here, the pleading asserts that New York City's segregated two-tier education system deprives Black and Latino students of a sound basic education because it relegates them to a perpetual underclass and precludes them from competing on a level playing field with students of other racial and ethnic backgrounds for access to public school resources. It alleges that defendants' deficient inputs—which include assigning students of color to segregated schools that are neglected and poorly maintained, forcing such students into [*20]overcrowded classrooms lacking sufficient textbooks and basic classroom equipment, instructing such students based on out-of-date curricula, and inadequately training teachers—result in starkly disparate outcomes for students of color. Those outputs include lower test scores and graduation rates and underrepresentation in the full scope of public school programming, such as G & T programs and extracurricular activities. Thus, plaintiffs claim that defendants' policies and practices fail to provide sufficient opportunities for students of color to develop the skills and critical abilities necessary to meaningfully engage as civic participants in our modern society and compete for living-wage employment.
I disagree with the majority that the pleading utterly fails to assert a cognizable claim that defendants have not satisfied their constitutional duty to provide a sound basic education. The majority's conclusion is based on its application of a heightened pleading standard that is perilously close to the standard on summary judgment or the proof required at trial.
First, the majority ignores that a segregated school system has long been recognized to violate the rights of students of color (see Brown v Bd. of Educ., 347 US 483, 493 [1954]; CFE I, 86 NY2d at 345 [Smith, J., dissenting in part] ["The Equal Protection Clauses of both the Federal and State Constitutions stand for the proposition that State action . . . cannot be used to condemn African-American, Latino or other children to an education which is inherently inferior"]). Nor does the State Constitution tolerate a segregated system characterized by unequal facilities, curricula, and teaching staff—exactly what plaintiffs claim here. Separate but equal is never equal, but here, plaintiffs allege that the educational opportunities available to students of color are not equal to those available to their White peers. Defendants' alleged conduct thus flies in the face of Brown v Board of Education's promise of an integrated public education serving as a gateway to social and economic mobility. Here, the majority overlooks that school segregation on its own can constitute a violation of the Education Article (see majority op at 12 n 5). The fact that a particular action or inaction might violate one or more constitutional provisions is not controversial. Plaintiffs raised three different causes of action grounded in two different constitutional provisions and one statutory provision and alleged overlapping conduct in support of each claim. While plaintiffs' claims regarding segregation are clearly relevant to an equal protection analysis, that does not mean they cannot also support a violation of the Education Article. Indeed, our Court's reasoned interpretation of the Education Article requires nothing less.
Second, the majority fails to apply the Court's prior directive that the sound basic education standard must evolve to a changing society (see CFE II, 100 NY2d at 931). It is true that plaintiffs chart new territory with their theories of an alleged racist pipeline that denies students of color the opportunities to benefit from the full offerings of the public school system. Still, much of what they assert has long been understood as an "input" (e.g. inadequate teacher training and certification) that can lead to an unconstitutional "output" (e.g. substandard teaching) (id. at 919). In any event, a novel theory can support a formerly recognized claim. Indeed, the Education Article standard anticipates continued reassessment through a fresh lens based on the contemporary demands of society. CFE I set forth the template establishing the "essentials" for a sound basic education, as the Court recognized them at that time (86 NY2d at 316), and CFE II expanded the standard to encompass employment opportunities (100 NY2d at 906).[FN13] Plaintiffs now argue for further reconsideration of the standard to address whether students of color can engage in civic life and compete on the job market if they are educated in a racially and ethnically segregated public school system that is designed to deny those students the same opportunities as other students to learn in safe and sanitary facilities, from properly trained staff, and in a manner that does not relegate them to an inferior status.[FN14] [*21]Unlike in Paynter, which involved wholly distinct underlying factual allegations, and contrary to the majority's assertion (see majority op at 12-13, 12 n 5), the pleading in the present case adequately alleges that the City public school system's deficient outputs—low test scores and graduation rates—are caused by deficiencies in teaching, facilities, and instrumentalities of learning (100 NY2d at 440-441). Plaintiffs may not ultimately prove these allegations, but I cannot agree that if they are true, we would conclude such a system provides a sound basic education within the meaning of the Education Article.
Third, the majority fails to persuade that the pleading does not sufficiently allege a district-wide failure (majority op at 10-12). Contrary to the majority's claim, plaintiffs did not limit their allegations to one school, but rather asserted deficiencies across the entire City public school system, while adding an example of what they allege are characteristics common throughout the unscreened public schools attended by students of color. Even now, the State and City do not contradict plaintiffs' narrative description. Similarly, themajority fails to adequately explain why plaintiffs' assertions—that unscreened schools are disproportionately composed of Black and Latino students, contain an insufficient number of textbooks, lack basic classroom materials, such as working markers, paper, and laboratory equipment for science classes, experience overcrowded classrooms, and expose students to neglected and unsanitary school buildings with recurrent leaks in school hallways and no toilet paper in bathrooms—are so "general" that it is unclear whether they apply district-wide (id. at 11-12). The pleading is crystal clear that these are the characteristics of the schools attended by students of color across the City. By every measure, the whole point of plaintiffs' claims is that the facilities, curricula, and staff in the segregated schools are deficient as compared to the facilities and programs provided to their White peers. The majority's claim that the pleading fails to provide "any benchmarks from which to assess these allegations" is more of the same application of the wrong heightened pleading standard (id. at 12). At the motion to dismiss stage, we accept the factual allegations as true and do not require plaintiffs to supply proof in accordance with the evidentiary burdens applied on a summary judgment motion or at trial.
The majority's failure to adequately assess the plaintiffs' complaint is, in part, a consequence of its comparison of this pleading to the CFE I complaint (id. at 10-13). Despite claiming that "CFE I is not a minimum standard for Education Article complaints" (id. at 12), the majority has essentially treated that complaint as the "liberal pleading" floor. However, CFE I does not state that the factual assertions made in that case were the bare minimum required by CPLR 3211 and our caselaw, or that the pleading sufficiency question was "close" (86 NY2d at 317-319). The pleading belies the majority's conclusion that plaintiffs do not assert even a single claim that the education system, as plaintiffs describe it, fails to provide a sound basic education for students of color.
V.
Equal Protection Cause of Action
The New York State Equal Protection Clause provides that "[n]o person shall be denied the equal protection of the laws of this state," and "[n]o person shall, because of race . . . be subjected to any discrimination in their civil rights . . . by the state or any agency or subdivision of the state" (NY Const, art I, § 11). Equal Protection claims based on the disproportionate impact of a facially neutral action or policy must show "[p]roof of racially discriminatory intent or purpose" (Arlington Hgts. v Metropolitan Hous. Dev. Corp., 429 US 252, 265 [1977]; see CFE I, 86 NY2d at 321 [holding that "an equal protection cause of [*22]action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination"]). The discriminatory intent or purpose need not be the sole cause, but simply a "motivating factor" for the alleged conduct (Arlington Hgts., 429 US at 265-266).
In determining intent, courts look to disparate impact as well as other relevant considerations, including "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up to the challenged decision[,]" and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body" (id. at 266-268 [internal citations omitted]). "The foreseeability of a segregative effect, or adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance, is a factor that may be taken into account in determining whether acts were undertaken with segregative intent" (United States v Yonkers Bd. of Educ., 837 F2d 1181, 1226-1227 [2d Cir 1987] [internal quotation marks and citations omitted] [finding discriminatory intent where, among Yonkers's 25 elementary schools, 61% of all students were White, more than 75% of the schools were either more than 80% minority or more than 80% White, and 92% of minority students attended just ten of the 25 schools]; see also Personnel Admr. of Massachusetts v Feeney, 442 US 256, 279 n 25 [1979] ["This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent"]).
The fact that a government actor was "on notice" of a disparate impact and did nothing to ameliorate it is relevant to an Equal Protection claim (see Davis v City of New York, 959 F Supp 2d 324, 362-363 [SDNY 2013] [crediting allegations that the City "was fully aware of residents' public complaints about its racially discriminatory trespass enforcement activities . . . but failed to take sufficient steps to address those complaints, leading to an inference that it intended for the racially discriminatory practices to continue"]). As the Appellate Division concluded below, "even when remedial efforts are taken, it is still possible to infer intent based on 'the inadequacy' of those efforts" (228 AD3d at 171, citing Floyd v City of New York, 813 F Supp 2d 417, 452-453 [SDNY 2011] [relying on statistics showing extreme disparate impact in finding a fact issue as to discriminatory intent with respect to the City's stop and frisk policies]).
Plaintiffs claim that "Black and Latinx students[ ] are denied the equal protection of the laws" by the educational system's separation of students into two groups: one largely White and economically privileged, and the other largely students of color and economically disadvantaged. According to plaintiffs, defendants have "intentionally adopted and adhered to a range of admissions, screening[,] and other policies that facilitate such inequality." Plaintiffs' assertions sufficiently plead a viable equal protection claim based on the State and City's use of the G & T test, the SHSAT, and other standardized tests used in screened middle and high schools.
Under our liberal pleading standards, we must accept as true plaintiffs' allegations that the G & T test, the SHSAT, and other standardized tests used in screened schools are unsound and unvalidated for their asserted purpose of identifying qualified students for such programs and schools. Plaintiffs allege that the SHSAT was historically used to exclude Black and Puerto Rican students from specialized high schools, that the Hecht-Calandra Act was passed to ensure the continued use of the test just as City officials were about to launch a critical assessment of its potential bias,[FN15] that defendants have failed to take action to evaluate the validity of the test ever since, that expert findings indicate the test is not appropriately designed [*23]to measure students' abilities to succeed academically, and that defendants' continued reliance on the test as the sole admissions criterion for its specialized high schools results in the disproportionate exclusion of Black and Latino students from those schools. The State and City defendants do not deny any of these allegations, but they claim that the allegations fail to establish intent as a matter of law. The majority agrees, relying on cases based on the proof required to establish intent at trial (see majority op at 18), engaging in a revisionist reading of the pleading which expressly alleges that the SHSAT lacks validity (see id. at 21), and accepting defendants' factual assertions as true (see id. at 20). But that approach contravenes our mandate to accept plaintiffs' factual assertions, accord plaintiffs the benefit of every possible favorable inference, and determine only whether plaintiffs' facts as alleged fit within any cognizable legal theory.
Contrary to the majority's contention, plaintiffs are not required, at this stage, to show "evidence" that the Act was passed with discriminatory intent (see id.). Indeed, the law does not require direct evidence of intent. Plaintiffs allege a damning historical context of the mandatory adoption of a gatekeeping high-stakes test that defendants have yet to validate, which continues to have a disproportionate adverse impact based on race and ethnicity, denying Black and Latino students equal access to the City's schools and educational programming, and which defendants continue to implement in the face of ongoing concerns that it is biased and not pedagogically sound. Plaintiffs also claim that the passage of the Hecht-Calandra Act itself was motivated, at least in part, by discriminatory intent, and they do not have to prove that this was the sole motivation. That is enough. Therefore, defendants have failed to establish that plaintiffs' allegations are legally insufficient at this threshold stage of the litigation.
VI.
New York State Human Rights Law Cause of Action
Executive Law § 296 (4) of the NYSHRL provides that it is "an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, . . . by reason of [their] race . . . ." In 2019, the Legislature made explicit that the NYSHRL "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed" (Executive Law § 300). Further, "[e]xceptions to and exemptions from" the NYSHRL "shall be construed narrowly in order to maximize deterrence of discriminatory conduct" (id.). Thus, we have stated that "[c]ourts must construe the [NYSHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible," to maximally achieve the statute's remedial antidiscrimination purposes (Syeed v Bloomberg L.P., 41 NY3d 446, 451 [2024] [internal quotation marks and citations omitted]; see Matter of Clifton Park Apts., LLC v New York State Div. of Human Rights, 41 NY3d 326, 332 [2024] [referencing the "legislative directive to construe the (NYSHRL) liberally to eliminate discrimination in this state"]).
For the reasons explained in the Equal Protection analysis, supra, section V, the pleading adequately alleged discriminatory intent in support of plaintiffs' NYSHRL claim. In addition, the pleading adequately asserts a claim based on disparate impact.
The Court has already recognized a viable NYSHRL employment discrimination claim under a disparate impact theory (see People v New York City Tr. Auth., 59 NY2d 343, 348-349 [1983] ["(A)n employment practice neutral on its face and in terms of intent which has a disparate impact upon a protected class of persons violates the (NYSHRL) unless the employer can show justification for the practice in terms of employee performance"]). I agree with the Appellate Division that there is no reason to limit the education discrimination provision at issue here to claims based on discriminatory intent (228 AD3d at 174). Such a narrow interpretation of the NYSHRL is contrary to the legislative mandate that we broadly interpret the entire statute. And we must assume that the Legislature was aware of our prior employment discrimination caselaw when it amended the NYSHRL without expressly limiting its scope to intentional education discrimination claims.
Plaintiffs assert that defendants' policies and practices violate the NYSHRL prohibition on discriminatory exclusion from educational facilities. According to plaintiffs, "[s]tudents are segregated by race and class from the moment they enter the City school system[ ] and indeed are more segregated in their schools than in the already highly segregated communities in which they live." Plaintiffs allege that, by design, students of color are "disproportionately relegated to neglected schools and inferior educational opportunities." Plaintiffs further claim that defendants maintain this system by continuing to use unvalidated standardized tests that have an adverse disproportionate impact on students of color. The pleading asserts that the organizational plaintiffs have multiple members who are City public school students of color who aspire to attend a screened middle or high school or a specialized high school and are qualified to attend such schools but have been deterred from applying or rejected due to the standardized tests.
Plaintiffs have sufficiently pleaded disparate impact based on the City defendants' alleged policies and practices that result in the disproportionate denial to Black and Latino students of equal access to the use of City facilities, namely specialized high schools, screened middle and high schools, and G & T programs. Here, the majority improperly concludes that the pleading did not sufficiently allege facts regarding individual students of color who were denied access to screened middle or high schools or specialized high schools as a result of the allegedly discriminatory standardized tests used to determine admission to those schools, even where those students were otherwise qualified to succeed at the schools (majority op at 21-22). The majority overlooks that when the only barrier to admission is an allegedly biased and pedagogically unsound test that plaintiffs assert is not appropriately designed to measure students' abilities to succeed academically, the students are otherwise qualified for those schools as City public school students. Accordingly, I would hold that plaintiffs stated a claim under the NYSHRL.
VII.
Conclusion
Plaintiffs allege that the New York City public school system maintains a racial and ethnic educational pipeline designed to subordinate and deny opportunities to students of color, particularly Black and Latino students. That pipeline runs throughout a segregated school system, described as a network of dilapidated and unsanitary physical infrastructures that are inadequately equipped, and where insufficiently trained staff deliver curricular programming that tracks students onto one of two paths. One path offers the majority of students of color an unsound and ineffective education and sets them in the direction of diminished expectations and dreams unfulfilled. The other path offers the majority of their White or well-resourced peers increased opportunities for academic and financial success and social status. Plaintiffs may not prove these allegations at trial, but that is not the question before us. We need only determine whether defendants have established that the pleading fails to allege any viable cause of action. Defendants have failed to do so with the limited exceptions noted by the Appellate Division. While the majority improperly reaches the merits (see majority op at 20, 22), whether plaintiffs can ultimately prevail is not part of the calculus in determining a motion to dismiss.
Every child in New York State has the right to an education in accordance with the constitutional and statutory guarantees of equality and access to opportunity. The law seeks to prepare future generations to meet the demands of our ever-changing society, so that they may engage meaningfully in the civic life of New York and compete on a level playing field for jobs. The pleading is a stunning indictment of the New York City public education system. And its allegations compel us to question whether education is the great leveler or whether it instead entrenches inequality. Plaintiffs' claims are more than "troubling" (id. at 2). They implicate discriminatory governmental practices and policies antithetical to an open, civilized, and diverse democracy.
I dissent.
Order insofar as appealed from modified, without costs, in accordance with the opinion herein and, as so modified, affirmed and certified question answered in the negative. Opinion by Judge Garcia. Chief Judge Wilson and Judges Singas, Cannataro, and Halligan concur. Judge Troutman dissents in part and votes to modify the order insofar as appealed from by dismissing the cause of action under the Education Article of New York State Constitution for the reasons stated in section II.A of Judge Garcia's majority opinion and to otherwise affirm for the reasons stated in sections V and VI of Judge Rivera's dissenting opinion. Judge Rivera dissents in an opinion.
Decided October 23, 2025

Footnotes

Footnote 1:Supreme Court granted the motion of organizational defendant, Parents Defending Education, to intervene.
Footnote 2: We agree with the Appellate Division that plaintiffs' claims are justiciable (228 AD3d at 161). While education matters often involve the "distribution of powers" between the branches of government, it is "the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions" (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 39 [1982]), and additionally, "this Court is responsible for adjudicating the nature of" the duty to provide a "sound basic education" (Campaign for Fiscal Equity, Inc. v State, 100 NY2d 893, 902 [2003] [internal quotation marks and citation omitted]).
Footnote 3: The Appellate Division dismissed plaintiffs' NYSHRL claim as against the State and plaintiffs do not appeal that decision (see 228 AD3d at 171-172).
Footnote 4: The dissent concludes that although the complaint may be "inartful," "pathetically drawn," "prolix," "provocative," "reek of miserable draftsmanship" and display "verbosity," those flaws do not justify dismissal (dissenting op at 19-20 nn, 11, 12 [emphasis added]). Perhaps not. But nor do those faults somehow excuse the failure to meet our minimal pleading standard.

Footnote 5: The dissent makes no effort to grapple with the facts in Paynter (100 NY2d at 438 [discussing and rejecting the plaintiffs' claim that "poverty concentration and racial isolation correlate with substandard academic performance" and therefore "by every measure of student achievement [the Rochester] schools do not deliver a sound basic education as required by the Education Article"]; see id. at 441). Rather, the dissent imports an equal protection construct into its Education Article analysis, citing to Judge Smith's dissent from the equal protection holding in CFE I (86 NY2d at 345, 347 [Smith, J., dissenting in part]), and referencing Brown v Board of Education (347 US 483 [1954]), when asserting, without any supporting authority, that "segregation on its own can constitute a violation of the Education Article" (see dissenting op at 24-26).
Footnote 6: The City and State each disclaim responsibility for ensuring that the City's public education system meets the constitutional standard. Because we hold that plaintiffs have failed to state a cognizable Education Article claim, we do not resolve that issue.
Footnote 7: The HCA also requires candidates for admission to the Fiorello H. LaGuardia High School of Music and the Arts to "pass competitive examinations in music and/or the arts in addition to presenting evidence of satisfactory achievement" (L 1971, ch 1212, § 1).
Footnote 8: The Appellate Division dismissed the NYSHRL claim against the State defendants, finding that "the State is not an 'educational institution' as defined in the Executive Law," and dismissed the harassment portion of this claim against the City defendants because plaintiffs failed to "sufficiently plead" any "nonconclusory allegations" that the City permitted the harassment of students by reason of race or that the City "even knew about the[] incidents" identified in the complaint (228 AD3d at 172). Plaintiffs did not appeal that holding.
Footnote 9: (see e.g. NY State Educ. Dept, Culturally Responsive-Sustaining Education, available at http://www.nysed.gov/common/nysed/files/programs/crs/culturally-responsive-sustaining-education-framework.pdf [providing recommendations on subjects including an inclusive curriculum, improving recruitment and retention of diverse teacher workforce, and providing teachers with diversity and inclusion training]; 2018 NY Assembly Bill A11321 [establishing a culturally responsive education curriculum and standards]; 2019 NY Senate Bill S5808-A [establishing a task force on educator diversity in New York State]; Clifford Michel, Council education committee passes diversity-reporting bill, May 26, 2015, available at https://www.politico.com/states/new-york/city-hall/story/2015/05/council-education-committee-passes-diversity-reporting-bill-089624 [bill requiring the "Department of Education to report annually on efforts and progress made to increase diversity" in public schools]; Press Release, NYC Office of the Mayor, Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools [June 3, 2018] [expanding Discovery program to 20 percent seats at each specialized high school]; Lola Fadulu, New York City to Expand Gifted and Talented Program but Scrap Test, NY Times, Apr. 14, 2022, available at https://www.nytimes.com/2022/04/14/nyregion/nyc-gifted-talented.html [discussing Mayor Adam's plan to expand the gifted and talented program by adding seats to the kindergarten and third grade classes and by eliminating the admissions test for that program and replacing it with a lottery system]).
Footnote 1: Supreme Court granted intervenor status to Parents Defending Education (PDE), a nationwide, Virginia-based organization whose members include the parents of six City public school students.

Footnote 2: Plaintiffs cite to data published by the Citizens' Committee for Children of New York, a research organization focused on child and family well-being, indicating that during the 2018-2019 school year, 41 percent of City schools did not reflect their administrative district's demographics, with 55 percent of those schools being elementary schools. For instance, one school, P.S. 87, had a school population that was 65 percent White, four percent Black, and 14 percent Latino, while the population of the surrounding district was 27 percent White, 28 percent Black, and 32 percent Latino.
Footnote 3: The complaint cites to additional expert research and news articles indicating that such practices may not be pedagogically sound (see Eliza Shapiro, Should a Single Test Decide a 4-Year-Old's Educational Future?, NY Times, Sept. 4, 2019, available at https://www.nytimes.com/2019/09/04/nyregion/nyc-gifted-talented-test.html [accessed Oct. 7, 2025] ["Experts say the single-exam admissions process for such young children is an extremely unusual practice that may be the only one of its kind nationwide"]; National Association for Gifted Children, Identification, https://www.nagc.org/identification [accessed Oct. 7, 2025] ["Identification needs to occur over time, with multiple opportunities to exhibit gifts. One test at a specific point in time should not dictate whether someone is identified as gifted"]).
Footnote 4: Plaintiffs cite to news reports and research finding that reliance on standardized test results for G & T programs leads to racial disparities within such programs (see Eliza Shapiro, Should a Single Test Decide a 4-Year-Old's Educational Future?, NY Times, Sept. 4, 2019, available at https://www.nytimes.com/2019/09/04/nyregion/nyc-gifted-talented-test.html [accessed Oct. 7, 2025]; Donna Y. Ford, Culturally and Linguistically Diverse Students in Gifted Education: Recruitment and Retention Issues, 74 Exceptional Children 289, 294 [Apr. 2008] [noting that researchers have demonstrated that "almost exclusive dependence on test scores for recruitment disparately impacts the demographics of gifted programs by keeping them disproportionately White and middle class"]; id. at 300; [explaining that relying on tests that require vocabulary and quantitative skills yields results that reflect a student's exposure to educational experiences prior to the test, mirroring and reproducing existing societal inequities]).
Footnote 5: Plaintiffs also cite to an analysis of 2020 admissions data at 27 of the City's top-performing screened high schools, which found that "White and Asian students were admitted at almost double the rates of Black and Latino students" (Colin Lecher & Maddy Varner, NYC's School Algorithms Cement Segregation. This Data Shows How, The Markup [May 26, 2021], available at https://themarkup.org/machine-learning/2021/05/26/nycs-school-algorithms-cement-segregation-this-data-shows-how [accessed Oct. 8, 2025]).
Footnote 6: Plaintiffs cite to media publications reporting on admissions statistics for Stuyvesant High School, indicating that only seven, ten, and eight Black students were admitted to the school in 2019, 2020, and 2021, respectively.
Footnote 7: In support of these allegations, the pleading cites to media coverage of the Act's passage and longstanding consequences (see Francis X. Clines, Assembly Votes High School Curb, NY Times, May 20, 1971, available at https://www.nytimes.com/1971/05/20/archives/assembly-votes-high-school-curb-limits-city-boards-power-to-ease.html [accessed Oct. 8, 2025] ["Sponsored by a white cross section of (legislators), the bill was drawn to defend against a special study initiated by the city's( ) school Chancellor, Dr. Harvey B. Scribner, to look into charges that the four (specialized high) schools were 'culturally biased' against (B)lack( ) and Puerto Rican( )" students]; Andrew H. Malcom, Scribner to Name Unit to Study Special-School Entrance Tests, NY Times, Feb. 24, 1971, available at https://www.nytimes.com/1971/02/24/archives/scribner-to-name-unit-to-study-specialschool-entrance-tests.html [ accessed Oct. 8, 2025]; Jim Dwyer, Decades Ago, New York Dug a Moat Around Its Specialized Schools, NY Times, June 8, 2018, available at https://www.nytimes.com/2018/06/08/nyregion/about-shsat-specialized-high-schools-test.html [accessed Oct. 8, 2025] ["The unambiguous purpose (of the Act) was to cut off a study of whether the test should be changed" and "(a)nother effect was to stop an effort to expand the admission of (B)lack and Latino students (to specialized schools) that was underway during the administration of John V. Lindsay, the liberal mayor"]).
Footnote 8: Plaintiffs also note that "[t]he New York City Board of Education strongly oppose[d] th[e] bill" (see Peter A. Piscitelli, Legislative Representative, NY City Bd of Educ, Mem in Opposition, May 4, 1971, Bill Jacket, L 1971, ch 1212 at 29-30; see also Letter from Assn of the Bar of the City of NY to Honorable Michael Whiteman, Executive Chamber, June 11, 1971, Bill Jacket, L 1971, ch 1212 at 45-46 [disapproving of the bill because "it attempts to establish, by legislative fiat and without prior investigation, an exclusive admission procedure whose intrinsic merit has been seriously questioned"]).
Footnote 9: Plaintiffs cite to a media publication in support of this allegation (see Winnie Hu, Does Admissions Exam for Elite High Schools Measure Up? No One Knows, NY Times, July 18, 2018, available at https://www.nytimes.com/2018/07/18/nyregion/shsat-new-york-city-schools.html [accessed Oct. 8, 2025] ["Unlike other high-stakes admission tests, . . . the SHSAT has not undergone an extensive vetting process known as predictive validity testing, which provides statistical evidence that a test is actually doing what it claims to do: In the case of the SHSAT, it would be identifying the students who can thrive in the accelerated academics of the specialized schools"]).
Footnote 10: Plaintiffs cite to a media publication in support of this allegation (see Christina Veiga, NYC graduation rates tick upwards in 2020, Chalkbeat, Jan. 14, 2021, available at https://www.chalkbeat.org/newyork/2021/1/14/22230843/nyc-graduation-rates-up-2020/ [accessed Oct. 8, 2025]).
Footnote 11: See also Foley, 21 AD2d at 64-65 ("It [is] well settled . . . that a pleading will not be dismissed for insufficiency merely because it is inartistically drawn"); Lam, 219 AD3d at 715 ("Although inartfully pleaded, a claim should not be dismissed when the facts stated are sufficient to make out a cause of action").
Footnote 12: " 'The pleading can be pathetically drawn; it can reek of miserable draftsmanship. That is not the inquiry on a motion under [CPLR 3211 (a) (7)]. We want only to know whether it states a cause of action. If it does, a [CPLR 3211 (a) (7)] motion does not lie and the pleading is immune from it' " (Foley, 21 AD3d at 65 n 1, quoting Siegel, 38 St. John's L Rev at 205).
Footnote 13: In Paynter, decided on the same day as CFE II, we recognized that "in CFE I[,] we . . . had no occasion to delineate the contours of all possible Education Article claims" (100 NY2d at 441).

Footnote 14: Contrary to the majority's narrow reading of plaintiffs' allegations, in contravention of our liberal pleading standards, plaintiffs do not merely assert that "disrupt[ing] the complex system of biases and structural inequities" in society through culturally sensitive curricula or faculty is a component of the constitutional standard for a sound basic education (see majority op at 14), but instead specifically allege that culturally competent curricula and a diverse teacher workforce that reflects students' identities, experiences, and communities improves students' academic performance, increases their engagement with their coursework, and prepares them for meaningful civic participation.

Footnote 15: In support of this allegation, plaintiffs cite to the Act's legislative history (see Mem in Support, June 4, 1971, Bill Jacket, L 1971, ch 1212 at 5 ["The purpose of this bill is to preserve and save the four specialized high schools in the City of New York"]; Letter from Mayor Lindsay to Governor Rockefeller, June 14, 1971, Bill Jacket, L 1971, ch 1212 at 21; Peter A. Piscitelli, Legislative Representative, NY City Bd of Educ, Mem in Opposition, May 4, 1971, Bill Jacket, L 1971, ch 1212 at 29-30; Letter from Assn of the Bar of the City of NY to Honorable Michael Whiteman, Executive Chamber, June 11, 1971, Bill Jacket, L 1971, ch 1212 at 45-46).